THE STATE, DEFENDANT IN ERROR, v. GEORGE E. MAUSERT, PLAINTIFF IN ERROR.

Submitted December 4, 1913—Decided March 4, 1914.

To convict on an indictment for keeping a bawdy house, knowledge by the defendant of the immoral practices claimed to be carried on therein is an essential element in the proof, and mere negligence of a hotel proprietor, while evidential on the fact of knowledge, is not its legal equivalent.

---

On error to the Court of General Quarter Sessions of the county of Essex.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and KALISCH.

For the plaintiff in error, *Frank E. Bradner.*

For the defendant in error, *Louis Hood,* prosecutor of the pleas.

The opinion of the court was delivered by

PARKER, J. Our examination of this record satisfies us that no prejudicial error occurred during the lengthy trial of the case until after the jury had retired and returned into court for further instructions; at which stage a charge that had been, if anything, over favorable to the defendant in the rules of law laid down, was vitiated by instructions that relieved the jury from the responsibility of a finding on an essential element of guilt.

The indictment was for keeping a disorderly house. The premises in question were a hotel property in Newark, ostensibly run as an hotel, of which defendant was concededly proprietor, but which the state claimed was operated as a bawdy house. The proof was confined to this question and the responsibility of defendant for and his cognizance and permission of the practices said to have been carried on there. The proof was ample to justify a jury in finding that defendant knowingly permitted such practices, and that question was submitted to them in the main charge, under instructions requested by defendant, and specifically charged, in part as follows:

"2. In order to convict the defendant the jury must be satisfied beyond a reasonable doubt that rooms were let to men and women for immoral purposes at the Hotel Broad habitually on and after January 1st, 1913, and that the defendant either had actual knowledge of such practices, or had such notice of the acts and conduct of persons who rented rooms that he was bound to infer that such persons hired the rooms for immoral purposes.

"I so charge you.

"3. In order to charge the defendant with notice of the immoral purposes of persons hiring rooms at the hotel, the acts and conduct of such persons must have been of such a nature that the only reasonable inference that could be drawn from such acts and conduct would be that such persons were at the hotel for immoral purposes.

"I so charge you.

"4. If the jury is satisfied that the only immoral acts committed in the hotel were those committed by men who obtained the rooms by deception and who misrepresented themselves to the defendant as married men present at the hotel with their respective wives, and that the defendant did not have any reasonable ground to suspect that such men were there at the hotel for immoral purposes, then the jury should find a verdict of not guilty.

"I so charge you."

Subsequently, the jury returned into court and the following colloquy ensued:

"The Court—Gentlemen of the jury, I understand you desire further instructions.

"The Foreman—Yes, your honor.

"The Court—In what respect?

"The Foreman—In regard to the legal responsibility of the proprietor of the hotel.

"The Court—Of the hotel in question in this case?

"The Foreman—Of a hotel.

"The Court—Not this particular hotel? ·

"The Foreman—We are debating on this particular hotel.

"The Court—But I understand you want the instructions generally and not specifically.

"The Foreman—Yes.

"The Court—I was under the impression that I made the matter of the responsibility of this defendant clear. I take it from the request that some question may have arisen in the minds of the jury ·as to the legal responsibility of a hotel keeper generally, as applicable to this particular case.

"The Foreman—Yes.

"The Court—It would seem to be unnecessary to repeat again what I have already said on that subject, but perhaps in the delivering of the charge the jury have not been able to retain everything that was said in regard to that point in their minds.

"This defendant was bound to exercise care—reasonable care—to see that his place was run in a proper and orderly manner. It was his duty to exercise the judgment of a care-

ful and conscientious man in admitting people to the hotel. The question resolves itself into whether he knew, or ought to have known from the circumstances, that his place was being used for immoral and illegal purposes. It is the duty of every hotel keeper, or of every person in charge of any public place of amusement or entertainment, to see that the law is not violated. That is one of the responsibilities that they assume when they open a place of amusement or a house of public entertainment, and if they permit violations of the law they are guilty of keeping a disorderly house and may be indicted. The question whether this defendant permitted the illegal acts complained of is one of the questions which you must determine from the evidence. That is a question of fact, not of law. As a matter of law, if violations of law occurred and he permitted them, either because he neglected to take ordinary precautions to see what was going on, or otherwise failed to use reasonable judgment, of course he is guilty, if you find, as I say, that that was the fact. It is a question of fact.

"Now, do you think that I have answered your question sufficiently and made the matter sufficiently clear to you?

"The Foreman—You have, to my mind, your honor.

"The Court—A man cannot shut his eyes to the obvious thing and then say that he had no knowledge of it."

(The jury again retires.)

These later instructions laid down a rule of law that was quite different from that embodied in the main charge, and one that we deem to be fundamentally erroneous, for they permitted, nay, required, a conviction on grounds of mere negligence in failing to ascertain what was going on in the house. If they were erroneous, of course the conviction will not be saved by the previous correct instructions. *Burnett* v. *State,* 31 *Vroom* 255; *State* v. *Tapack,* 49 *Id.* 208. The rule is specially applicable here because the jury were (to judge from the colloquy) probably debating the very question whether carelessness in permitting the use of the hotel to promiscuous guests would in itself justify conviction.

The "keeping" of a bawdy house, or, indeed, a disorderly house of any kind, is something that connotes consciousness

of the character of the place. That such consciousness may be brought home to the accused party as a matter of fact by evidence showing a course of practice, or frequent acts, of which in the natural order of things he would have been cognizant, and to which his assent would be as a matter of fact naturally implied, is perfectly clear. On this point it is sufficient to cite the recent decision by the Court of Errors and Appeals in *State* v. *Callahan,* 48 *Vroom* 687; but the jury must determine as questions of fact—*first,* that the defendant was proprietor or in control; *second,* that the house was disorderly, and *third,* that defendant knew it, before there can be a conviction. This is conspicuously so in the case of an owner renting a house which is used by the tenant for immoral purposes, where the owner must be shown to have known the purposes to which it was to be put. 3 *Bish. Cr. Pro.,* § 121; 9 *Encycl. L. (2d ed.)* 528. Indeed, under some of the English cases even this would not suffice for a conviction.

In *Reg.* v. *Barrett,* 1 *Leigh & C.* 263, defendant was landlord, and after notice that the premises were used as a bawdy house, continued to let it to the same tenants by weekly hirings as before. The fact that with this knowledge he did not turn the tenants out was held not to make him liable as keeper. A similar ruling was made in *Reg.* v. *Stannard, Id.* 349. But most of the English law on this subject is statutory or based on statutes, and so not especially apposite. The statutes are collected in *Coll. Cr. Stat., tit. "Nuisance,"* 399 *et seq.* It is worth while, however, to call attention to the English statute of 1885, 48 and 49 *Vict., c.* 69, § 13, which makes punishable by fine and imprisonment any person who (1) keeps or manages or assists in the management of a brothel; or (2) being the tenant, lessee or occupier of any premises knowingly permits them to be used as a brothel or for the purposes of habitual prostitution; or (3) being the lessor or landlord of any premises, or his agent, lets them or any part thereof with the knowledge that they are to be used as a brothel, or is willfully a party to the continued use of such premises as a brothel. This act seems closely to correspond with the general trend of our cases.

The rule as to knowledge is substantially the same where the defendant is charged not as landlord but as proprietor, though the element of knowledge is somewhat obscured by its implication in the word "kept" and "keeping" as well as by being taken for granted in most of the reported cases. We think the reports will be searched in vain for a ruling by an appellate court that mere negligence in conducting an hotel constitutes the knowledge that is an element of the crime. A hotel keeper cannot investigate the antecedents and character of every couple that puts up at his house; though of course where the practices are such that an ordinarily intelligent person would understand their meaning, even if not to a moral certainty, the existence of knowledge may be found by the jury. But such knowledge must be found as a fact by a jury and not predicated by the court from negligent conduct by binding instructions.

The rule, as stated in the text of 14 *Cyc.* 488, is that "the person accused of keeping a disorderly house must have knowledge of the character of the house and must have consented to its use to authorize his conviction." The facts that may be shown as indicating such knowledge are indicated on pages 506, 507. And in 9 *Encycl. L.* (*2d ed.*) 526, the text reads: "A man is not criminally responsible for permitting his house to be used for purposes of prostitution, or other unlawful purposes, either at common law or under the statutes, unless he knowingly permits it to be so used." So, Mr. Bishop says: "Bawdry in a house without the knowledge or acquiescence of its keeper, would not subject him to punishment." 3 *Bish. Cr. Pro.,* § 118 (2).

The cases, so far as they deal with the question, bear out this proposition.

In *Drake* v. *State,* 14 *Neb.* 536; 17 *N. W. Rep.* 117, the indictment was under a statute for permitting a house of which defendant was the owner to be "used and occupied as a house of ill-fame." The Supreme Court said that the prosecution was required to show three principal facts—*first,* that the house was a house of ill-fame, defining that phrase; *second,* that the defendant was the owner or had control of it, and

*third,* that he knowingly permitted it to be used and occupied for such purposes.

*Padgett* v. *State,* 68 *Ind.* 46, was an indictment for keeping a gaming house. The premises consisted of a saloon and billiard room and a bedroom, over the latter in which the gaming was practiced, but it did not appear that defendant was cognizant of the fact. The court said: "In a case like this, the fact that the defendant kept or suffered his house to be used for gaming may be proved by circumstances, but the proof must at least show that he had knowledge that his house was resorted to for gaming. * * * The evidence, as we construe it, did not either show or fairly tend to show that the defendant had any knowledge of the gaming testified to." The conviction was accordingly reversed.

In *State* v. *Currier,* 23 *Me.* 43, cited and relied on in the Indiana case, the indictment charged that defendant, contrary to the statute, "kept a bowling alley which was then and there resorted to for the purpose of gaming." The charge was to convict if the defendant "owned and had control of a place resorted to for the purpose of gaming," but the Supreme Court said that that ownership and control did not necessarily amount to "keeping" and sustained the exception.

In *State* v. *Cooster,* 10 *Iowa* 453, the charge of the court in a gaming house case was "that the law presumed the defendant's permission if it was done on premises under his control." The court said that this proposition was believed not to be the law, but sustained the conviction on the ground that if the jury had been charged that they must be satisfied the defendant had personal knowledge of the gaming before he could be found guilty, their verdict under the evidence would have been the same. This latter proposition would be plainly untenable in this state; but the case is authority on the point that knowledge must be shown.

Our own cases are in nowise to the contrary. In *State* v. *Callahan,* 48 *Vroom* 685, already cited, the court said (on *p.* 687): "In order to convict the defendant, it was necessary to prove in addition his knowledge, and this could be proved only by circumstances;" and the opinion goes on to recite

circumstances similar to those in the case at bar from which it says, "a jury could hardly avoid an inference of knowledge on his part."

In *State* v. *Ackerman,* 33 *Vroom* 456, the indictment charged a servant of the owner or proprietor as participating in the keeping; and (on *pp.* 460, 461) the late Mr. Justice Dixon, speaking for this court, said the question would be "whether the servant participated in the keeping of the house with knowledge of such facts as, under the legal presumption that he knew the law, apprised him that the house was disorderly," and goes on to discuss the question of knowledge in this aspect. The point involved was the rejection of evidence offered by defendant that his master had made representations to him that led him to believe, notwithstanding suspicious circumstances, that the house was lawfully conducted. This was held injurious error. The opinion adds that the court's charge "indicates that his rulings on the subject were induced by his opinion that the testimony in the case established beyond controversy the inculpatory knowledge of the defendant." The conviction was reversed.

The same disposition must be made of the case at bar. This seems unfortunate, in view of the fact that the case was thoroughly tried, and the evidence ample, as we read it, to justify a jury in reaching a conviction upon the theory that defendant's actual knowledge of the character of the house was demonstrated. But, as we have observed, this question by the final instructions of the court was not left to the jury, who were in effect told that negligence, irrespective of knowledge, would suffice; and, as we have also observed, it is not only possible but likely, in view of what was said, that this very instruction turned the scale toward conviction. The prejudicial character of the error is plain; it was duly excepted to and specified as a ground of reversal as well as assigned for error, and has been relied on in the brief. There is only one course for us to take, and that is to reverse the judgment and award a new trial.